Filed 7/11/23

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D080917 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. RIF1900604) |
| MARILYN JOY ZEMEK, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Riverside County, Samuel Diaz, Jr., Judge. Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Collette C. Cavalier and Kathryn Kirschbaum, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Marilyn Joy Zemek of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1); elder abuse (§ 366, subd. (b)(1); count 2); two counts of grand theft (§ 487, subd. (a); counts 3 and 5); identity theft (§ 530.5,

---

[1] Statutory references are to the Penal Code unless otherwise specified.

subd. (a); count 4); and perjury (§ 118; count 6). Regarding count 2, the jury found true that Zemek caused the death of the victim who was then over 65 years and under 70 years of age within the meaning of section 368, subdivision (b)(3)(A). Also, concerning counts 3 and 5, the jury found true that Zemek committed two or more related felonies involving fraud with the taking of more than $100,000 within the meaning of section 186.11, subdivision (a)(1).

The court sentenced Zemek to prison for an indeterminate term of 25 years to life on count 1, plus a total determinate term of five years, comprised of eight-month terms (one-third the middle term) on each of counts 3, 4, and 5, and the middle term of three years on count 6. Under section 654, the court stayed the sentence on count 2 as well as the corresponding enhancement.

Zemek appeals, contending: (1) she was denied her right to a public trial; (2) the trial court erred by failing to sufficiently investigate and then dismiss a juror for misconduct; (3) insufficient evidence supports her murder conviction; (4) the trial court erred in denying her request for a pinpoint jury instruction; and (5) the trial court erred in permitting evidence of her prior thefts. We conclude none of these arguments has merit. As such, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

For many years, Pam, who lived alone, suffered from seizures and anxiety, for which she took phenobarbital and benzodiazepine (Valium). Especially for the elderly, this drug combination may cause mental confusion, and an overdose can be deadly.

In late 2015, Zemek met Pam, and the two quickly became friends. A few months later Pam was hospitalized after a phenobarbital overdose. In

April 2016, she was again hospitalized after another overdose. Although still "confused" and "delirious," she was discharged to a skilled nursing facility until she was able to return home.

After that second hospitalization, Zemek contacted Dennis M., who at the time held Pam's durable power of attorney.[2] She offered to take care of Pam for $18 per hour to provide "meals, hygiene" and ensure Pam was "*properly taking her medication*, getting exercise safely, and staying current and up to date with bill paying and doctor's appointments, et cetera." (Italics added.) Dennis told Zemek that his sister and father took phenobarbital for epilepsy and "it was a very dangerous drug."

In early May 2016, Pam was "much more absentminded and forgetful." Zemek told Dennis she would work weekends too "to get [Pam] straightened out" on her medications.[3] But Pam's health continued to decline, and about two weeks later she could no longer feed herself. For example, after leaving Pam alone for just 15 minutes, Zemek returned to find her on the floor in a puddle of urine.

In mid-May, Pam was again hospitalized following yet another phenobarbital overdose. This time it caused respiratory failure and

---

[2]     Dennis owned a real estate company, and Pam was a former client. For a time, they were good friends. Later, Pam suspected that Dennis had swindled her out of her home.

[3]     In a police interrogation, Zemek claimed that a home health care provider, Visiting Angels, was hired to "come and organize" Pam's medications. But Visiting Angels does not manage or administer medications and, in any event, Pam was never one of its clients. A similar entity, Guardian Angels, was referred to Pam during this time period, but it was never engaged to provide her services.

hallucinations.[4] She was once more discharged to a skilled nursing facility because it was " '[u]nsafe [for her] to return home alone.' " Pam was "extremely restless," "confused," and "severely impaired [in] making decisions."

On May 27, Zemek took Pam out of the nursing facility—purportedly for a day trip. With Pam wearing nothing but a hospital gown, they went to her bank. Pam told the manager that she did not trust Dennis and wanted to make sure he was not a beneficiary on her accounts.

Zemek did not return Pam to the nursing facility until nearly midnight, and did so only after staff threatened to call the police. Even then, she pressured Pam to leave with her.[5] Pam signed herself out that night—against doctors' orders.

The next day, Zemek took Pam to see John Gallegos, an attorney who had defended Zemek in three prior criminal cases. According to Gallegos, Pam thought Dennis had swindled her out of her home, and she wanted him off the power of attorney and out of her will. Gallegos drafted a new durable power of attorney naming Zemek. He also wrote a new estate plan for Pam, making Zemek the sole beneficiary of her will, executor, and trustee.

On June 1, Zemek took Pam to an urgent care facility for a hand injury. The intake form identifies Zemek as Pam's "best friend and caregiver." Nine days later, Pam signed the new will leaving everything to Zemek.

---

[4] Pam reported seeing Zemek in the adjacent hospital bed and ants crawling on the walls.

[5] Nursing staff claimed that Zemek "brainwashed" Pam into leaving. In contrast, Zemek claimed the facility was "an absolute nuthouse dive," with "crazy people walking the halls . . . screaming and yelling." She said Pam "[n]ever once got bathed" and was fed "slop." According to Zemek, Pam told her, "I'm not going back there. There's no way in hell . . . ."

Zemek last spent time with Pam on June 13. Despite making several unanswered phone calls between June 14 and 17, Zemek did not return to check on Pam's welfare until about 11:30 a.m. on June 17—when she found Pam dead in a chair, the victim of an apparent drug overdose.

Zemek called 911. When the police arrived, she identified herself as Pam's "friend and caretaker." Zemek explained that Pam told her to take some time off to be with her husband, and she had not seen Pam for several days.

Hundreds of phenobarbital pills were found in Pam's home, along with a large quantity of Valium. In an ashtray next to her body were white pills and a bowl of partially eaten Jell-O. A white powdery substance and gelatin was around her mouth. Although Pam died from a phenobarbital overdose, the pathologist could not determine whether it was an accident, a suicide, or a homicide. She died between eight and 48 hours before Zemek found her body.

Zemek began clearing out Pam's bank account the same day. Within about a year, she had taken over $200,000 and used Pam's credit cards more than 100 times. On two separate occasions during recorded telephone calls to Pam's banks (played for the jury), Zemek impersonated Pam to request an extension of credit.

The jury heard that this was not the first time Zemek used a position of trust to facilitate theft. In 1998 while working in a surgeon's office, she stole jewelry from a patient's purse during an outpatient procedure. Then two years later, Zemek made a house call on a woman who had undergone in-office surgery, purportedly to give her a shot for postoperative pain. The shot rendered the patient unconscious. Just before losing consciousness, the

patient heard her son say, " 'What are you doing in mom's closet?' " Inside a bank safe deposit box rented to Zemek the police found both victims' jewelry.

## DISCUSSION

## I

## PUBLIC RIGHT TO TRIAL

### A.  Zemek's Contentions

Zemek contends her public right to trial was violated because her husband and sister were not permitted to watch her trial from within the courtroom.  Instead, the trial court closed the physical courtroom to the public but permitted the public to follow the trial via livestream.  Zemek's husband and sister, as part of the public, enjoyed the same access to the trial. As we explain *post*, we conclude that Zemek's Sixth Amendment right to a public trial was not violated under the facts of the instant matter.

### B.  Background

On October 1, 2020, before voir dire, the trial court explained:

> "At this time, as of October 1st, there's been 59,405 confirmed cases and 1,226 confirmed deaths, and 130 people are currently hospitalized in the County of Riverside due to coronavirus. At this time, there's less than ten people in the courtroom.  Due to the emergency orders in place and because of the public health directive from Dr. Kaiser, his recommendation is that there should be no more than ten people in the courtroom. He's reviewed certain procedures that we sent him back in November—back in June. He inspected the courthouse and accepted the procedures.  At this time, Court finds good cause to close the courtroom to the public; however, we are livestreaming on the Internet as we speak, and the public and the press or anyone else could listen to the stream. The Court at this time will admonish both the witnesses for the People and the defense not to listen to the livestream prior to testifying. Both parties are ordered to inform their witnesses of that fact."

Six days later, during jury selection, defense counsel asked the trial court to allow Zemek's spouse and sister to sit in the courtroom. That request led to the following exchange:

> "[Defense Counsel]: I'm asking the Court to allow Ms. Zemek's husband, David Zemek, and his sister to attend this trial.
>
> "THE COURT: They will be allowed to attend via livestream.
>
> "[Defense Counsel]: I'm asking for them to be allowed to attend in person.
>
> "THE COURT: If there was a request that the victim's family be allowed, they will be allowed also via livestream. So the request is they can hear these proceedings via livestream. I cannot have more than 18 prospective individuals, 18 plus the numbers that we have here, I cannot do that. The Court already made a finding at the beginning of the trial, good cause, and I think you object. If you don't, we'll make your objection. Court found good cause that these proceedings are closed to the public, and we'll note your objection. But that was at the very beginning.
>
> "[Defense Counsel]: They are not the public. They are family.
>
> "THE COURT: They are the public.
>
> "[Defense Counsel]: Family and friends of the defendant.
>
> "THE COURT: Sir, once again, we're playing antics. They are the public, they are. And the public, under the good old days, this is an open court. Anyone from the public could come in, anyone in any hearing. The Court made good cause findings to close the proceedings to the public, and the alternate is to allow them to listen on livestream.
>
> "[Defense Counsel]: I understand that, but I think it's important for the defendant to have the support of close

friends and family. I think it's recognized under the United States Constitution and the California Constitution. It's not like they're newspaper reporters, it's not like they are just free-floating members of the public, they are close to this defendant. And I think under the Constitution, one or two more seats is not going to interfere with the number of jurors that we have impaneled, including the alternates, to allow them to be here. They can be socially distanced. They could spread out.  It's not going to interfere with any of the COVID protocols, and it's going to provide the essential moral support to my client.  And it also will allow the jury to see that she's not an orphan, that there are people here who care for her and are concerned about these proceedings.

"THE COURT:  I thank you for your request, but my ruling remains. And if the victim's family wants to be present, and I know there's a statute on point, right on point, Marsy's Law, the Court ruling is still that unfortunately we cannot accommodate. The Court already found good cause.  But they can be more than happy to listen via livestream."[6]

In the presence of the jury, on October 13, 2020, before the trial began, the trial court again illustrated its position on having the public in the courtroom during trial:

"As of today, October 13th, there's been 61,824 confirmed cases of COVID-19 and 1,056 confirmed deaths, and there are currently 145 people in the County of Riverside in the hospital.  [¶]  At this time, there's about 29, 30 individuals in the courtroom. Dr. Kaiser is recommending—or has ordered the Riverside County Public Health Department and the courts to social distance. We are livestreaming on the Internet. Court finds good cause to close the

---

[6]     Marsy's Law, also colloquially known as the Victims' Bill of Rights, provides that a victim is entitled to be present at "all public proceedings . . . at which the defendant and the prosecutor are entitled to be present . . . ."  (Cal. Const., art I, § 28, subd. (b)(7).)

proceedings to the public, but we are livestreaming. Everyone has access to the courts via the Web."

The morning after the first day of trial, defense counsel informed the trial court that Zemek's "husband and family were unable to hear great portions of yesterday's proceedings due to some snafu with the livestream." The courtroom clerk confirmed the livestream stopped working around 10:30 a.m. but worked after lunch. It appeared to have been out for about two hours.[7] Again, defense counsel asked for Zemek's husband and close family to be allowed into the courtroom to watch the trial:

> "My concern is again that under the First Amendment, my client's entitled to a public trial, and that applies with more force to her husband and close family relations. And to the extent that they're unable to hear the proceedings or portions of them, I think her First Amendment right to a public trial is being bridged. And I would reiterate our request to have her husband be allowed to attend these proceedings in person as well as her sister. [¶] And I would note for the record that there appears to be two seats in the back row that are unoccupied by anybody and they could be socially distanced, six feet apart, if the Court would permit them to attend."

The court responded:

> "All right. I'll note your recommendation and your request.
>
> "The Court at the beginning of the trial made certain findings and that continues on. As a matter of fact, hospitalizations have been up the last two days in Riverside County. I don't have the latest stats today. Let me look it up, it shouldn't take more than 30 seconds.
>
> "Once again, the Court is following the presiding judge's orders and the public health director's recommendations,

---

[7] The record is not clear regarding how much of the two hours consisted of actual trial time.

Dr. Kaiser. And as of October 14, 2020, there have been 62,553 confirmed cases, 1,258 confirmed deaths. So we went up, I think five since yesterday. And hospitalizations have been up. Last time we spoke, it was 138. Now we're up to 146 people currently hospitalized from coronavirus.

"So the Court continues to find good cause. The jurors are spread out as much as we can. I'm not even allowing the victim's family under Marsy's Law because the Court's making a good finding under good cause to close these proceedings."

Defense counsel then pointed out that the victim had no family. The court indicated that it was not aware of that fact. The court then thanked defense counsel, noted they were running about seven minutes behind schedule, and asked if defense counsel had anything else to add. Defense counsel did not, and the court called in the jury.

On the morning of October 29, with about two-thirds of the trial completed, the court was informed that "some people are trying to listen in on livestream, and are not able to hear anything." The court asked, "someone from IT" to "look into it as soon as possible." Just before the noon recess, the court noted the livestream was working. But in the afternoon "the entire livestream system just shut down."

Two court days later, defense counsel again noted "there is room in the back row" for Zemek's husband and sister "to be socially distanced," observing that he had previously requested they be allowed to attend trial, but the court denied the request. The court acknowledged the previous request and denial and added, "the victim advocate sits in the back. Also your investigator has been in the back row." Counsel replied, "There's still room for at least her husband and her sister" and "[b]eyond that," the livestream had not been working "at least three or four days." The court admitted to receiving complaints about the livestream but noted that every

10

time it received a complaint, it, "in good faith, put in . . . requests to have someone in IT come." The clerk then noted that the livestream was not picking up the microphones in the courtroom and that the "IT person" said it was not going to be "an easy fix." The judge directed the clerk to determine if there was an empty courtroom with livestream service. Meanwhile, the jury returned to the courtroom and testimony resumed. Later that morning, the trial was moved to a different courtroom with livestream service.

## C. Applicable Law

A criminal defendant has a right to a public trial that is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by article 1, section 15 of the California Constitution. (*Waller v. Georgia* (1984) 467 U.S. 39, 46 (*Waller*); *People v. Woodward* (1992) 4 Cal.4th 376, 382 (*Woodward*).) "Every person charged with a criminal offense has a constitutional right to a public trial, that is, a trial which is open to the general public at all times. [Citations.]" (*Woodward*, at p. 382.)

"The right to a public trial serves two important interests. It protects those who are accused of a crime by helping to ensure that the innocent are not unjustly convicted and that the guilty are given a fair trial. [Citation.] Second, there is a 'strong societal interest in public trials'; they provide an opportunity for spectators to observe the judicial system, improve the quality of testimony, encourage witnesses to come forward with relevant testimony, and prompt judges, lawyers, witnesses, and jurors to perform their duties conscientiously. [Citation.]" (*People v. Scott* (2017) 10 Cal.App.5th 524, 530 (*Scott*).)

Even so, the right to a public trial "is not absolute" and must be "balanced against other interests essential to the administration of justice." (*United States v. Osborne* (5th Cir. 1995) 68 F.3d 94, 98, citing *Waller*, *supra*,

11

467 U.S. at p. 45). Such interests include "the size of the courtroom, the conveniences of the court, the right to exclude objectionable characters and youth of tender years, and to do other things which may facilitate the proper conduct of the trial." (*Woodward*, *supra*, 4 Cal.4th 376, at p. 388 (conc. opn. of Mosk, J.), citing *People v. Hartman* (1894) 103 Cal. 242, 245.)

We consider de novo a defendant's claim that he was denied his constitutional right to a public trial, but review the trial court's underlying factual determinations for substantial evidence. (*Scott*, *supra*, 10 Cal.App.5th 524, 531.) Where a defendant has been deprived of this right, "no showing of prejudice is required '[b]ecause the right to a public trial protects the defendant from very subtle but very real injustices,' and '[re]quiring such a defendant to prove actual prejudice would deprive most defendants of the right to a public trial.'" (*Id.* at p. 532.)

### D.    Analysis

The trial here occurred under difficult circumstances, a time when COVID-19, a global pandemic, continued to terrorize the community, and when the federal government provided recommendations and suggestions that, at times, seemed to change on a consistent basis. This was a time, too, when COVID-19 vaccines were not yet available. (See *Stepien v. Murphy* (D.N.J. 2021) 574 F.Supp. 3d 229, 234 [noting that "vaccines became widely available in the Spring of 2021"].) In other words, at the time of the trial in the instant matter (October through November 2020), the world looked much different than it does today, especially considering that the federal emergency declaration regarding the COVID-19 pandemic expired on May 11, 2023, and its California counterpart expired February 28, 2023. This context is important in viewing the trial court's actions.

Certainly, the trial court understood the gravity of the public health emergency the residents of Riverside County were facing. In explaining that no member of the public would be able to observe the trial from within the courtroom, the trial court specifically recited, no fewer than three times, the infection, hospitalization, and death rates caused by the COVID-19 virus in Riverside County. The court noted that the rates continued to increase throughout the trial. The trial court explained that pursuant to a local public health directive, no more than 10 people were to be present in the courtroom. Therefore, the court allowed the trial to be livestreamed to the public but did not permit the public to watch the trial from within the courtroom.

As the United States Supreme Court has acknowledged, "[s]temming the spread of COVID-19 is unquestionably a compelling interest." (*Roman Catholic Diocese of Brooklyn, New York v. Cuomo* (2020) ___ U.S. ___, [141 S.Ct. 63, 67, 208 L.Ed.2d 206].) Given the impact of the COVID-19 pandemic on Riverside County at the time of Zemek's trial, we agree that the goal of limiting the transmission of COVID-19 while holding a trial was an overriding interest. The parties here do not dispute this. Indeed, Zemek admits "that initially by livestreaming the proceedings the court instituted an adequate alternative to allow the public at large to watch and listen to the

trial court proceedings."[8] Yet, Zemek faults the court for not allowing her husband and sister to sit in the back of the courtroom, socially distanced, and observe the trial. To this end, she argues, "by denying [her] request to allow two of her close family members to attend the proceedings, the court failed to narrowly tailor the interest it sought to protect, and the jury was never aware that [Zemek] had family members who were supporting her in the course of the trial." Alternatively stated, Zemek seems to suggest that the livestreaming of the trial was sufficient to make her trial public (as long as the livestream functioned properly), but the trial court's refusal to allow her spouse and sister into the courtroom to watch the trial in person violated her right to a public trial, nonetheless.

---

[8] In her opening brief, Zemek suggests the livestream allowed the public to "watch and listen" to the trial. The record is less clear regarding the livestream output. For example, the trial court stated, "the public and the press or anyone else could listen to the stream" and directed counsel to admonish their witnesses "not to listen to the livestream prior to testifying." Later, the court stated that Zemek's family "can hear these proceedings via livestream" and the public could "listen on livestream." Neither party discusses this issue, so we do not consider whether the ability to hear but not see proceedings has Sixth Amendment significance. (See *United States v. Allen* (9th Cir. 2022) 34 F.4th 789, 796 (*Allen*) [a trial transcript is not an adequate substitute for access to the courtroom and "an audio stream is not substantially different than a public transcript."].) Despite not reaching this issue, we do not mean to imply that we agree with *Allen* on this point. "[T]ranscripts of testimonial evidence" fail to "fully reflect what was communicated by the testifying witness" because they "cannot capture the sweaty brow, the shifty eye, the quavering voice." (*In re Schoenfield* (2d Cir. 1979) 608 F.2d 930, 935.) Livestreaming oral testimony, however, allows the listener to hear the witness's voice, any pauses or sobs, and to evaluate the volume and confidence with which she testifies. Thus, we disagree with the dissent's conclusion that the court closure here "was effectively 'total' " when all testimony was contemporaneously livestreamed to the public.

Ostensibly, Zemek's argument seems to suggest the public right to trial requires a special preference to be given to a defendant's close family members. Thus, according to Zemek, it was not a violation to prohibit the general public from personally watching the trial, but her rights were infringed when Zemek's spouse and sister also were precluded. In response, the People rely on *Martin v. Bissonette* (1st Cir. 1997) 118 F.3d 871 (*Martin*) for the proposition that, in considering a defendant's right to public trial, "the same standard applies to family members as to the general public."[9] However, Zemek claims the People have misrepresented her position. She maintains she is not arguing that a different standard for exclusion applies to her husband or sister than does the general public. She clarifies that she is simply asserting that the court, by excluding her spouse and sister along with the rest of the public, did not "narrowly tailor the interest it sought to protect." Yet, in making this argument, she notes " 'the Supreme Court has specifically noted a special concern for assuring the attendance of family members of the accused.' " (*Vidal v. Williams* (1994) 31 F.3d 67, 69.) Moreover, Zemek contends, "[h]ere the trial court disregarded this important concern." Thus, Zemek appears to be implying that, under the Sixth Amendment, a defendant's close family members are just different. Alternatively stated, a defendant's right to a public trial includes a right to

---

9    We observe that *Martin, supra,* 118 F.3d 871 is not necessarily on all fours with the instant matter. There, the defendant's family had been intimidating certain witnesses to testify falsely. (*Id*. at p. 873.) The trial court ordered the courtroom closed until the witness was excused and made no exception for the defendant's mother. (*Ibid*.) The appellate court found no Sixth Amendment violation. (*Id*. at p. 875.) That said, we note that the court did not consider additional rights or apply a different standard to the preclusion of the defendant's family from the courtroom in that case.

have her close family observe the trial beyond the access provided to the public in general.

In the instant matter, the record indicates that the trial court specifically considered that Zemek was requesting for her family members to observe the trial in person. For example, in response to one of defense counsel's requests to allow Zemek's spouse and sister to attend the trial, the trial court noted its previous findings about the impact of COVID-19 on Riverside County, the presiding judge's orders, and the health director's recommendations while noting that it was not allowing the victim's family to observe the trial in person either. In this way, the court was informing defense counsel that it was not unfairly prohibiting Zemek's family from attending the trial but instead, was applying the prohibition equally to all members of the public.[10]

In another exchange between the trial court and defense counsel, the trial court clearly understood that counsel was asking for Zemek's spouse and sister to attend the trial in person, but the court noted that Zemek's family was part of the public and the court found good cause to close the courtroom to the public. Zemek's trial counsel insisted Zemek's spouse and sister were "not the public" but were "family," arguing that the Constitution recognizes the importance of "the defendant to have the support of close friends and

---

[10] The record indicates that defense counsel pointed out to the court that the victim had no family. Yet, the absence of any family for the victim does not change our analysis here. The court was not justifying its order to prohibit the public from observing the trial in person on the basis that it was not allowing the victim's family to attend. Instead, it was merely pointing out that no member of the public was allowed to attend the trial regardless of their relationship to the defendant or victim. Additionally, as the court stated on the record no fewer than three times, it was closing the courtroom to the public to prevent the spread of the COVID-19 virus and to combat the rising infection, hospitalization, and death rates from the deadly coronavirus.

families." The court, however, disagreed, pointing out that Zemek's family could follow the trial via livestream like the rest of the public.

Thus, as these exchanges between the court and defense counsel illustrate, the court did consider the presence of Zemek's family at the trial, noted that her family was part of the public, and reiterated that it found good cause to limit the public to following the trial on livestream. And although Zemek's trial counsel argued that the Constitution provided for Zemek to have the support of her close family personally present at trial, Zemek has not developed that argument in her briefs on appeal. Rather, she merely refers to the Supreme Court's "special concern" of this issue. This concern was alluded to in *In re Oliver* (1948) 333 U.S. 257 (*Oliver*).

In *Oliver*, *supra*, 333 U.S. 257, the Supreme Court reversed a contempt conviction imposed by a judge in a proceeding closed to everyone except perhaps a prosecutor and a court reporter.[11] (*Id.* at p. 259.) The court found that this practice violated the defendant's right to a public trial. (*Id.* at pp. 272–273.) The court made its finding after noting, in dicta, that "without exception all courts have held that an accused is at the very least entitled to have his friends, relatives and counsel present, no matter with what offense he may be charged." (*Id.* at pp. 271–272.) However, in reaching its conclusion, the court neither sketched a test for courtroom closures nor provided the contours for the constitutional right. Further, the court's holding did not rest on the failure to admit a family member. Rather, the

---

11    *Oliver* involved a Michigan state judge acting as a " 'one-man grand jury' " who disbelieved an individual's testimony based, in part, on the testimony of another witness. (See *Oliver*, *supra*, 333 U.S. at p. 258.) The state judge "immediately charged [the witness] with contempt, immediately convicted him, and immediately sentenced him to sixty days in jail." (*Id.* at p. 259.)

Court held that a trial in total secrecy, in the highly unusual circumstances presented there, was unconstitutional. (*Id.* at pp. 272–273.)

Thirty-six years later, the Supreme Court considered closure during a suppression hearing, held that the right to a public trial is not absolute (*Waller*, *supra*, 467 U.S. at p. 45), and established the four-part test applicable to a complete courtroom closure: the prosecution must show an overriding interest likely to be prejudiced by an open courtroom; the closure must be no broader than necessary; the court must consider alternatives to a complete closure; and the court's findings must be adequate to support the closure.[12] (*Id.* at p. 48.) Neither *Oliver* nor *Waller* specifically addressed the exclusion of a defendant's family members. Further, those two cases do not stand for the proposition that the Sixth Amendment should be read to provide greater rights to observe a trial to a defendant's close family members than what is provided to the public. And we observe that neither the United States Supreme Court nor the California Supreme Court has addressed this issue. That said, we need not answer this question today.

---

[12] We acknowledge that "[t]he test for determining whether a particular closure order violates a defendant's right to public trial changes depending on whether the courtroom closure is total or partial." (*Allen*, *supra*, 34 F.4th at p. 797.) Here, Zemek seems to suggest that the closure was partial as she admits that the court provided an adequate alternative to allow the public to follow the trial via livestream. Yet, she still claims her right to public trial was violated because the trial court did not allow her husband and sister to observe the trial from the courtroom. For their part, the People argue that the closure was partial, but in the alternative maintain that, even if we were to conclude the closure was total, the trial court satisfied *Waller's* four part test. In any event, whether the closure was partial or total is not dispositive here. The parties agree that the trial court had an overriding interest to prohibit the spread of the COVID-19 virus. And even when a closure is partial, it still must be narrowly tailored to ensure the governmental interest. In the instant matter, Zemek says it was not so narrowly tailored while the People say it was. That is the crux of the dispute here.

Rather, the salient issue before us is whether the trial court's order was narrowly tailored to achieve its interest of prohibiting the spread of the deadly COVID-19 virus.

As Zemek acknowledges in her reply brief, the trial court articulated that it had been advised that there should be no more than 10 people in the courtroom. However, Zemek points out that when the jury and the five alternates were present then there was up to an additional 17 people in the courtroom, surpassing the recommended 10-person limit. Thus, Zemek appears to suggest that because the trial court had already exceeded that 10-person limit that it had no choice but to allow Zemek's spouse and sister to sit in the back row of the courtroom if they could be socially distanced from each other and the other individuals in the courtroom. We disagree.

In viewing Zemek's request through the lens of May 2023, it may not seem unreasonable. Now, COVID-19 vaccinations and booster shots are abundantly available to the public. The stay-at-home orders and social-distancing guidelines were lifted long ago. There no longer exist any federal, state, or county COVID-19 restrictions. But that was not the landscape in October 2020. In a time with no vaccinations, stay-at-home orders, and rising infection, hospitalization, and death rates in Riverside County, we think it unfair, from our pristine perch in May 2023, to declare that the trial court did not narrowly tailor its order to address the crisis because it simply did not allow Zemek's spouse and sister to sit in the back of the courtroom during the trial. We reach this conclusion despite acknowledging that in late 2020 one of the recognized tools to *reduce* exposure was to physically distance people six feet apart. (See *Tarpey v. State* (Wy. 2023) 523 P.3d 916, 922 (*Tarpey*).) Although social distancing could lessen possible virus exposure, it was no guarantee. In the face of the increasing threat of COVID-19, we

19

cannot fault the trial court here for limiting the individuals physically in the courtroom to those necessary for the trial: the parties, attorneys, courtroom personnel, jurors, and testifying witnesses. Nor will we say the order closing the courtroom to the public was not narrowly tailored to achieve a compelling interest. Each additional person permitted inside the courtroom (a confined space) is an additional person who may have COVID-19 and increases the risk of infection to courtroom staff, jurors, and trial participants. In short, the restriction on public access to the courtroom was essential to a higher value, protecting the health and immediate safety of litigants, trial participants, and court employees from exposure to people who may be contagious for COVID-19 and limiting the spread of COVID-19 to the broader public. Moreover, the exclusion of the public was narrowly tailored and not broader than necessary to protect the public health. And the fact the trial was available to the public via livestream helped to further assure the integrity of the judicial process. (See *Oliver*, *supra*, 333 U.S. at p. 270 ["The knowledge that every criminal trial is subject to contemporaneous review in the forum of public opinion is an effective restraint on possible abuse of judicial power"].) Under these circumstances, we determine that Zemek's right to public trial was not violated. Our conclusion is buttressed by the several courts that have found similar restrictions passed constitutional muster. (See e.g., *Tarpey, supra,* 523 P.3d at pp. 929–930 [finding no Sixth Amendment violation where courtroom was physically closed to the public but the trial was broadcast so the public and the press could listen to the trial]; *United States v. Rosenschein* (D.N.M. 2020) 474 F. Supp.3d 1203, 1210 [concluding that "provid[ing] the public with appropriate electronic access to the hearing" through Zoom satisfied defendant's public trial rights during the pandemic]; *Vazquez Diaz v. Commonwealth* (2021) 487 Mass. 336, 167 N.E.3d

822, 838–841 [holding a sentencing hearing was not closed to the public where it was conducted entirely via Zoom made accessible to the public "either through a Zoom link where nonparticipants' video displays are turned off and sound is muted, or through an audio-only telephone line," reasoning "there [was] no limit on who or how many individuals [could] virtually or telephonically attend the hearing"]; *Peters v. State* (Nev. 2022, No. 82437) 521 P.3d 417 LEXIS 847, at *2 (concluding public trial rights were preserved where district court "provided the live stream alternative to ensure the right to a public trial was afforded"); *Williams v. State* (Tex.Crim.App. 2022, No. PD-0504-20) 664 S.W.3d 266 LEXIS 647 at *1, *29 [rejecting public trial challenge to exclusion of defendant's brother during testimony of one witness where the brother was still allowed to view the testimony via a livestream in an adjacent courtroom and describing the livestreaming accommodation as "the defining feature of this case"]; *State v. Williams* (Wash.Ct.App. 2022, No. 55269-8-11) 2022 Wash.App. LEXIS 1595 at *1 [concluding trial was not truly "closed" where public was provided access through Zoom, YouTube, and local television broadcast even though YouTube channel went down during a portion of the trial]; *Lappin v. State* (Ind.Ct.App. 2021) 171 N.E.3d 702, 704–707) [affirming trial court's decision to limit public observation of voir dire to an audio-only livestream broadcast to the courthouse lobby].)

Zemek also maintains that the trial court violated her right to a public trial when the livestream of the trial experienced technical difficulties because the court did not either suspend the trial until the technical issues were resolved or allow spectators to attend the trial in person until the livestream problems were solved. We reject these contentions.

As a threshold matter, as noted by the People, Zemek did not ask the court to suspend the trial when livestream was not working and did not ask

for spectators to temporarily watch the trial in person until the livestream problems were fixed. As such, she has forfeited those claims on appeal. (See *Sander v. Superior Court* (2018) 26 Cal.App.5th 651, 670.) Anticipating forfeiture, Zemek asserts her trial counsel was constitutionally ineffective by failing to sufficiently address the livestream technical difficulties.

A defendant seeking reversal for ineffective assistance of counsel must prove both deficient performance and prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) To demonstrate prejudice, a defendant must show a reasonable probability that he would have received a more favorable result had counsel's performance not been deficient. (*Id.* at pp. 694–695.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.) "The likelihood of a different result must be substantial, not just conceivable." (*Harrington v. Richter* (2011) 562 U.S. 86, 112.)

"On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.) Where counsel's trial tactics "for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

Here, on the record before us, we cannot say that defense counsel did not have a tactical reason for not requesting that the trial court suspend the trial whenever the livestream was not working properly. Perhaps, counsel

did not make such a request because he believed delaying the proceeding would have harmed his client. Or maybe a delay would have caused defense counsel scheduling problems with his witnesses.

In addition, Zemek has not shown that she was prejudiced by her trial counsel's failure to specifically ask for her spouse and sister to sit in the courtroom while the livestream was not functioning properly. As we discussed *ante*, the court's decision to physically close the courtroom to the public and provide a livestream feed of the trial was justified. Thus, it appears unlikely that the court would have been moved by the additional consideration of a livestream that malfunctioned on occasion. Moreover, the few times the livestream had problems, Zemek's trial counsel used those occasions to renew his request for the court to allow Zemek's spouse and sister to observe the trial from within the courtroom. Thus, the court was aware of both defense counsel's continued requests as well as the malfunctioning of the livestream. The fact that defense counsel did not explicitly make the connection between the livestream issues and the requests for Zemek's spouse and sister to attend the trial in person would not have made a difference on the record before us.

Additionally, to the extent that Zemek is arguing that her right to a public trial was violated the few times the livestream malfunctioned, we are not persuaded. Zemek's trial was a lengthy, seven-week trial. It appears that the livestream did not work a few times, for hours at a time. That said, the fact that the public could not follow the testimony of a few witnesses does not otherwise erode the trial court's efforts to maintain the public nature of the trial. Indeed, when notified of a problem with livestream, the trial court asked for assistance and was mindful of the issue. When it appeared that the livestream would take a while to fix, the trial court arranged to move to

another courtroom where livestream was working.  There is no indication in the record that the trial court ignored other technology that was available to the Riverside Superior Court to stream the trial.  And Zemek does not point to any other steps the trial court could have taken to address the problem (short of allowing the public to watch the trial from the courtroom).

For these reasons, we conclude Zemek's right to a public trial was not violated.

## II

## ALLEGED JUROR MISCONDUCT

### A.  Zemek's Contentions

Zemek claims that after a juror was overheard commenting about the defense's lengthy closing argument, the trial court erred by failing to conduct an inquiry into the statement as well as failing to discharge the juror.  We disagree.

### B.  Background

On the 20th day of trial, defense counsel's closing argument began at about 11:30 a.m. and, even after resuming after the noon recess, was not finished by the end of the day.  As court adjourned that afternoon, the defense investigator heard Juror No. 11 say, "This trial's never going to end. That's his strategy."  The prosecutor corroborated the report, also hearing the end of the comment about "that's his strategy."

The next morning before the jury was brought in, Zemek's trial counsel asked the court "to investigate" the matter, stating:

> "[The statement] indicates that the juror's already made up
> his own mind in violation of the court's instruction to keep
> an open mind.  And he's discussing his view of the case
> with another juror or other jurors before the case has been
> given to him to deliberate.

24

"And I'm very concerned that this sort of behavior is prejudicial to the defense, and I'd like the court to investigate it."

The prosecutor agreed "that the statement happened," but asserted there was no misconduct because the juror was not discussing "the evidence or the law." Noting "it has been a very long trial" and "a very long closing argument session," he asked the court to simply admonish the juror "just to be patient with the process and not to factor in the duration of the process into the deliberations."

The court then commented:

"All right. I'm going to bring in all the jurors and admonish them. Had I heard something to the effect like I've already made up my mind, this is BS, what are we doing here, those are the things that would concern the Court.

"It doesn't look like the juror is expressing any views of the evidence, maybe his frustration that closing argument lasted the entire day, but it is what it is. I'm not going to shut down the People or the defense in their closing arguments. If you want to go on for three days, it's fine with me. If you want to go on for ten days, it's fine with me. It doesn't bother me. I have other trials lined up. They just have to wait their turn. I preside over one trial at a time.

"All right. I'll bring all the jurors in and I'll generally tell them what happened on Tuesday and admonish the jurors not to discuss the case or express their opinion one way or another."

Also, the court asked defense counsel if he was moving for a mistrial. Counsel responded in the negative but asked the court to bring in Juror No. 11, ask him if he admits to what he said, and, if so, excuse him. Counsel then emphasized that the juror was not supposed to be discussing the case and argued:

25

"We've put all the evidence. He's not supposed to be discussing the case with any other jurors before being given the case to deliberate. He's committed misconduct. He needs to be excused."

The court noted that it agreed with defense counsel "that there was some misconduct," but the court made clear that it did not believe what was said required that the juror be excused.

The judge then addressed the jury, stating:

"Ladies and gentlemen of the jury, on November 10th toward the end of the afternoon, I believe, right before we adjourned or right after we adjourned, one of the jurors made a statement as he was, or she was walking out. It is very important that you do not, do not express any opinion about this case until you are in the jury deliberation room. It was a long day. It was a long day, so be it. But you're not to express your opinion to any jurors or to anyone else regarding the case.

"Are we on the same page?

"(Jurors collectively respond in the affirmative.)"

## C. Analysis

"The federal and state Constitutions guarantee a criminal defendant the right to a trial by an impartial and unbiased jury. [Citations.] A deprivation of that right can occur even if only one juror is biased. [Citation.]" (*People v. Brooks* (2017) 3 Cal.5th 1, 98.) An impartial jury is one in which no member has been improperly influenced and each member is capable of deciding and willing to decide the case solely on the evidence before it. (*In re Hamilton* (1999) 20 Cal.4th 273, 293–294.) Upon a showing of good cause, section 1089 authorizes a court to discharge a juror who is "found to be unable to perform his or her duty . . . ."

Jurors are prohibited from forming or expressing any opinion on the case "until the cause is finally submitted to them." (§ 1122, subd. (b).) A juror who violates this duty, such as by prejudging a case, has committed misconduct. (*People v. Linton* (2013) 56 Cal.4th 1146, 1194.)

The trial court "must hold a hearing when it learns of allegations which, if true, would constitute good cause for a juror's discharge." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 69–70; see *People v. Bradford* (1997) 15 Cal.4th 1229, 1348 ["A hearing is required only where the court possesses information which, if proved to be true, would constitute 'good cause' to doubt a juror's ability to perform his or her duties and would justify his or her removal from the case."].) However, "[c]ourts should exercise caution when undertaking inquiries that threaten to trench on the sanctity of jury deliberations, for the preservation of secrecy during deliberations fosters an atmosphere conducive to a frank and open discussion of the issues among jurors. Ensuring such secrecy also insulates the jury from improper influence that could be brought to bear by outside forces and supports the stability of jury verdicts." (*People v. Wilson* (2008) 44 Cal.4th 758, 829 (*Wilson*).)

"The decision whether to investigate the possibility of juror misconduct as well as the ultimate decision whether to retain or discharge a juror is subject to the sound discretion of the trial court. [Citations.] This discretion is, however, ' "at most . . . limited." ' [Citations.] The trial court's discretion under this section is 'bridled to the extent' the juror's inability to perform his or her functions must appear in the record as a 'demonstrable reality,' and 'court[s] must *not* presume the worst' of a juror. [Citations.]" (*People v. Bowers* (2001) 87 Cal.App.4th 722, 729, italics added; see *People v. Manibusan* (2013) 58 Cal.4th 40, 53 [" 'a hearing is required only where the court possesses information which, if proven to be true, would constitute

27

"good cause" to doubt a juror's ability to perform his [or her] duties and would justify his [or her] removal from the case' "]; *People v. Ray* (1996) 13 Cal.4th 313, 342–344 [trial court did not abuse its discretion when it did not make a further inquiry after receiving note that juror knew daughter of victim from school because note indicated that juror did not talk with the daughter about the case]; *People v. Kaurish* (1990) 52 Cal.3d 648, 694 [no hearing required when juror made derogatory remark directed toward defense counsel absent inference that remark was result of improper or external influences].)

Although we review the court's decision here for abuse of discretion (*People v. Holloway* (2004) 33 Cal.4th 96, 124–125), we will not find error in the court's decision unless the record shows as a demonstrable reality the juror was unable to perform his duty (§ 1089; *People v. Martinez* (2010) 47 Cal.4th 911, 943).

Here, our inquiry focuses not on whether "there is uncertainty in the record concerning what occurred because the trial court did not conduct an inquiry," but "whether the information the trial court was aware of when it made its decision warranted further inquiry." (*People v. Fuiava* (2012) 53 Cal.4th 622, 703.) On the record before us, we determine it was not unreasonable for the trial court to have declined to further investigate. Further, " ' " '[a] hearing is required only where the court possesses information which, if proven to be true, would constitute "good cause" to doubt a juror's ability to perform his duties . . . .' " ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 506.) Below, there was no dispute as to what Juror No. 11 said. The juror did not comment on the evidence. The juror did not say that he had already made up his mind. Rather, he expressed his frustration regarding the length of defense counsel's closing argument. In light of this record, we see little purpose in the court questioning Juror No. 11 about his

statement. Accordingly, we do not find the juror's statement rises to the level of good cause to excuse him. (See *People v. Allen and Johnson, supra*, 53 Cal.4th at pp. 69–70.)

Moreover, the trial court did not fail to address Juror No. 11's comment. Instead, it took appropriate action by admonishing the jurors to not "express any opinion about this case until [they were] in the jury deliberation room." Although a more thorough admonishment would have included the phrases "not to discuss the case" and "not to form any opinion" until the cause is submitted to them, the jurors were so instructed (per CALCRIM No. 3550)[13] before and after closing arguments and before the matter was submitted to them.

In short, Juror No. 11's comments did not indicate that the juror had made up his mind or was considering extrinsic matters to reach a verdict. The comments do not reveal a demonstrable reality that Juror No. 11 was incapable of performing his duties. Alternatively stated, we find that Zemek was not prejudiced by the comments. "Trivial violations that do not prejudice the parties do not require removal of a sitting juror." (*Wilson, supra*, 44 Cal.4th at p. 839; see *People v. Miranda-Guerrero* (2022) 14 Cal.5th 1, 27 [juror's comment to spouse that she would be done late, a verdict had been reached, and possibly what the verdict was did not evidence prejudice or cause juror to be incapable of serving during the jury phase]; *Wilson*, at

---

[13] CALCRIM No. 3550 provides, in pertinent part: "As I told you at the beginning of trial, do no talk about the case or about any of the people or any subject involved in it with anyone, including, but not limited to, your spouse or other family, or friends, spiritual leaders or advisors, or therapists. You must discuss the case only in the jury room and only when all jurors are present. Do not discuss your deliberations with anyone. Do not communicate using social media or other similar applications during your deliberations."

pp. 839–840 [finding juror's comment, "The whole thing is a problem with authority, and this is what happens when you have no authority figure" during the guilt phase of the trial was a "trivial" violation evidencing no prejudice]; *People v. Steward* (2004) 33 Cal.4th 425, 510 [juror comment to the defendant's girlfriend that she was attractive deemed "trifling" with no reasonable probability of prejudice]; *People v. Loot* (1998) 63 Cal.App.4th 694, 698 [concluding that a juror's question to the deputy public defendant whether the prosecutor was "available" was trivial and did not require removal of the juror].)

III

SUBSTANTIAL EVIDENCE

A.  Zemek's Contentions

Zemek argues that substantial evidence does not support her conviction for murder in the first degree.  Specifically, she claims the evidence failed to establish that she acted willfully, deliberately, and with premeditation.  We disagree.

B. Analysis

The prosecution's murder theory was that as a paid caregiver, Zemek had a legal duty to care for Pam.  Violating that duty, she deliberately left Pam alone for several days, intending that she self-administer a fatal overdose of phenobarbital (as Pam had done three times before), leaving Zemek as her sole beneficiary.

Murder by omission is an unusual way to intentionally kill, but not unheard of.  " 'The omission of a duty is in law the equivalent of an act and when death results, the standard for determination of the degree of homicide is identical.' " (*Zemek v. Superior Court* (2020) 44 Cal.App.5th 535, 551 (*Zemek I*).)

Here, Zemek concedes that her "failure to carry out the duty of care she owed to [Pam] ultimately resulted in [her] death." She further concedes that "an omission—a failure to act—constitutes an affirmative act for purposes of the commission of a crime in California as long as there is a legal duty to act."

She maintains, however, that in defining first degree murder, the trial court gave CALCRIM No. 521, which made no reference to any failure to act, and instead stated that "the defendant acted with premeditation if she decided to kill before *completing the acts* that caused death." (Italics added.) Zemek does not complain that this instruction was an erroneous statement of law.[14] Rather, she claims that because the prosecution failed to prove that she "completed an affirmative act that caused [Pam's] death," there was no substantial evidence that she committed first degree murder *as defined* in the instructions given to the jury.[15]

The analysis begins with the jury instructions on murder because, as Zemek correctly asserts, the issue on appeal is whether substantial evidence supports the jury's conclusion under the instructions *as given*, and not whether the evidence might prove guilt on some other legal theory that was not presented. (See *People v. Kunkin* (1973) 9 Cal.3d 245, 251.) Here, the jury was instructed that murder may be based on an omission where the defendant has a legal duty to act:

---

[14] Both sides asked that it be given.

[15] By asking the trial court to give CALCRIM No. 521, defense counsel implicitly conceded there was substantial evidence to support it. Nevertheless, we address the point without regard to any forfeiture under the invited-error doctrine.

"To prove the defendant is guilty of [murder], the People must prove that:

"One, the defendant had a legal duty to care for [Pam] and the defendant failed to perform that duty and the failure caused the death of another person.

"And two, when the defendant acted *or failed to act*, she had a state of mind called malice aforethought. [¶] There are two kinds of malice aforethought: Express malice and implied malice. . . . The defendant acted with express malice if she unlawfully intended to kill. [¶] The defendant acted with implied malice if she, one, intentionally committed the act *or failed to act*. [¶] Two, the natural and probable consequences of the act *or failure to act* were dangerous to human life. [¶] And three, at the time she acted, *or failed to act*, she knew her act *or failure to act* was dangerous to human life. [¶] And four, she deliberately acted *or failed to act* with conscious disregard for human life."

"[¶] . . . [¶]

"An act *or failure to act* causes the death if the direct—if the death is direct, natural and probable consequence of the act *or failure to act* and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether consequence [*sic*] is natural and probable, consider all the circumstances established by the evidence.

"There may be more than one cause of death. An act *or failure to act* causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes death." (Italics added.)

In defining first degree murder, CALCRIM No. 521 was not modified to include similar "failure to act" language. The court instructed:

"If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder in the first degree as defined in the jury instruction CALCRIM number 521.

"CALCRIM 521: The defendant is guilty of first-degree murder if the People have proved that she acted willfully, deliberately, and with premeditation. A defendant acted willfully if she intended to kill; the defendant acted *deliberately* if she carefully weighed the considerations for and against her choice, and knowing the consequences decided to kill; *the defendant acted with premeditation if she decided to kill before completing the acts that caused death.*"[16] (Italics added.)

Zemek's argument might carry some weight if CALCRIM No. 521 was the only murder instruction given. But it was not, and "[w]e evaluate the jury instructions as a whole, 'not from a consideration of parts of an instruction or from a particular instruction.'" (*People v. Thomas* (2023) 14 Cal.5th 327, 369.) Reading the instructions as a whole in the context of a case in which the prosecution put on no evidence that Zemek committed affirmative-act murder, the jury could convict only on a failure to act theory.

Indeed, in closing argument defense counsel urged the jury to read CALCRIM No. 521 precisely this way—telling the jury that "act" should be understood to mean a *failure to act*:

"When you get all of these instructions to when the defendant acted or failed to act, *well, we know the act is out. So we cross that out because it's a failure to act at this point.* It's the only viable theory he's got left.

"And then further down express malice, defendant acted with express malice. Well, *actually that should be failed to act, comma, with express malice.* Defendant acted with

---

16     Both parties requested CALCRIM No. 521 as given.

implied malice if she intentionally committed the act again is out. It should be if she *intentionally failed to act*. The natural and probable consequences of the failure to act[,] because *we're not talking about an act*. We're not talking about the poisoning. That's gone. It's done. It's finished. It's kaput. At the time she *failed to act*, *not at the time she acted*, she knew her failure to act, *not her act*, was dangerous to health and life.

"And, four, she deliberately failed to act with conscious disregard for human life.

"And then down below, an act or failure to act. Well, again, *we're not talking about an act anymore, so it's failure to act, consequence of the act or failure should be just the failure to act, and the death would not have happened without the failure to act.*" (Italics added.)

The prosecutor echoed these remarks, stating:

"Some people kill people with guns. Some people kill people with knives. All the defendant had to do was walk away to kill this victim, abandon her duty of care that she had assumed upon herself to care for this person. And that was what caused the death of [Pam]. [¶] And that is why the defendant is guilty of murder in this case."

We further conclude there was substantial evidence to support the first degree murder conviction on a failure to act theory. Zemek removed Pam from a skilled nursing facility that managed her phenobarbital and placed her in an apartment where she would be isolated and alone for days, with ready access to hundreds of pills. She knew (1) Pam was incapable of taking care of herself; (2) phenobarbital was a potentially deadly drug; (3) Pam had recently self-overdosed on it three times, once causing respiratory arrest; and (4) there were hundreds of phenobarbital pills in the home. Despite all this, Zemek left Pam alone there for several days, failing to check on her even after repeated telephone calls went unanswered. The jury could reasonably

conclude that Zemek waited it out to make sure Pam was dead and not merely unconscious.  That is premeditated murder.  The motive was simple: Greed.  Just days after making Zemek her sole beneficiary, Pam was left alone to predictably self-inflict a fourth overdose of phenobarbital.

Shifting the discussion away from the evidence, in a related argument Zemek further contends that as a matter of law, first degree premeditated murder cannot be based solely on a failure to act.  We disagree.

Murder requires a killing, and we acknowledge that most involve an act designed to kill.  The trigger is pulled; the knife is thrust.  But nothing in the definition of murder—"the unlawful killing of a human being . . . with malice aforethought"—suggests that it cannot be accomplished by means of an omission.  (§ 187, subd. (a).)  Indeed, in common experience an omission often can make the difference between life and death.  Ask any farmer in the Imperial Valley what will happen if there is a failure to irrigate crops.

In California, "the omission of a duty is in law the equivalent of an act," even in a homicide.  (*People v. Burden* (1977) 72 Cal.App.3d 603, 616 (*Burden*).)  In *Zemek I*, Division Two of this court considered this issue when Zemek challenged a magistrate's order holding her to answer for murder. (*Zemek I*, *supra*, 44 Cal.App.5th at p. 538.)  Because the magistrate found implied but not express malice, Zemek maintained the prosecution was precluded from trying her for first degree murder.  (*Id.* at p. 549, fn. 8.)  The Court of Appeal rejected that assertion, stating there was sufficient evidence of express malice and "the People still have the option of prosecuting [Zemek] for first degree murder."  (*Ibid.*)

" ' "The law of the case doctrine states that when, in deciding an appeal, an appellate court 'states in its opinion a principle or rule of law necessary to the decision, that principle or rule . . . must be adhered to throughout its

subsequent progress, both in the lower court and upon subsequent appeal.' " ' " (*People v. Kocontes* (2022) 86 Cal.App.5th 787, 819 (*Kocontes*).) The doctrine applies to pretrial writ proceedings—such as *Zemek I*—where the matter is fully briefed, there is an opportunity for oral argument, and the cause is decided by a written opinion. (*Kocontes*, at p. 819.) Accordingly, we conclude that not only is Zemek's argument inconsistent with *Burden*, *supra*, 72 Cal.App.3d 603, it is in any event foreclosed here by the law of the case effect of *Zemek I*.

In urging us to redecide the point, Zemek contends the prior writ decision "did not state as a principle of law that first degree premeditated murder can be based on the failure to act where there is a duty to do so." Although it might not have been expressly stated, that conclusion was implied. The court would not have specified that "the People still have the option of prosecuting [Zemek] for first degree murder" unless the theory was legally permissible.

Zemek further asserts that the writ petition was wrongly decided because it is inconsistent with *People v. Whisenhunt* (2008) 44 Cal.4th 174 (*Whisenhunt*). She reads *Whisenhunt* to require "an affirmative act in order to constitute the requisite malice for murder." We interpret *Whisenhunt* differently.[17] In any event, the law of the case doctrine applies even where

---

[17] In *Whisenhunt,* a child died of injuries inflicted where she lived with her mother and the defendant. (*Whisenhunt, supra,* 44 Cal.4th at p. 181.) The jury found the defendant guilty of first degree murder. On appeal, he argued that a second degree murder instruction should have been given on a theory that he failed to provide the child medical care. Addressing that point, the Supreme Court stated the "defendant provide[d] no authority that a failure to act can, on its own, constitute an 'intentional act' for implied malice murder." (*Id.* at p. 217.) Zemek construes this to mean that a failure to act cannot be the basis for murder. An equally plausible reading is that this was a comment on the adequacy of briefing in that case.

" 'in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous.' " (*Kocontes*, *supra*, 86 Cal.App.5th at p. 819.)

## IV

## JURY INSTRUCTIONS

### A.  Zemek's Contentions

Zemek contends the trial court prejudicially erred in declining to provide her request for a pinpoint instruction.  We reject this contention.

### B.  Background

During the jury instruction conference, defense counsel requested a special, pinpoint instruction on causation.  The requested instruction read as follows:

> "A cause of death is an act or omission that sets in motion a chain of events that produces death as a direct, natural and probable consequence of the act or omission, and without which the death would not occur.
>
> "In general, proximate cause is clearly established where the act is directly connected with the resulting death, with no intervening force operating. While the defendant may also be criminally liable for a result directly caused by his or her act, or failure to act, even though there is another contributing cause, in general an independent intervening cause will absolve a defendant of criminal liability.
>
> "In order to be independent, the intervening cause must be unforeseeable, an extraordinary and abnormal occurrence which rises to the level of an exonerating, superseding cause.
>
> "You must decide whether the defendant's failure to visit the decedent between June 13 and June 17, 2016 set in motion a chain of events the direct, natural and probable consequence of which was the death of Pamelia P[.] If you decide that it did, you must then decide whether:

37

"a) the decedent accidentally overdosed; or

"b) the decedent committed suicide,

"and, if so, whether that is an independent intervening cause."

The prosecutor objected to the request, arguing that the issue of causation was properly addressed in the standard CALCRIM instructions and that portions of the requested pinpoint instruction incorrectly stated the law. Defense counsel insisted the requested instruction "pinpoints facts in the case that have been introduced and can be considered. And it goes further than the standard instruction in defining for them what an independent intervening cause is, which is nowhere described in any of the [prosecution's] instructions." Counsel further asserted that the pinpoint instruction points to the two only realistic ways Pam could have died (accidental overdose or suicide) and directs the jury to consider whether either or both could be considered an independent intervening cause of Pam's death. In response, the prosecutor emphasized that he did not want to explore the issue of suicide with the jury because "[e]ven a suicide would be [Zemek's] responsibility because of her failure to perform her duty."

The trial court ultimately declined to give the instruction. It explained that it "learned very early on not to deviate too far from the CALCRIM jury instructions. The Court of Appeals frowns about that. . . . So in an abundance of caution, the court will give CALCRIM 520, not the Special Instruction No. 1, failure to act."

The jury was given four instructions that discussed causation: CALCRIM No. 520 (murder), CALCRIM No. 580 (lesser included offense of voluntary manslaughter); a special instruction on elder abuse enhancement; and CALCRIM No. 620 (special issues regarding causation).

CALCRIM Nos. 520 and 580 as well as the special instruction on the elder abuse enhancement were similar, and provided, in relevant part:

> "An act or failure to act causes death if the death is the direct, natural, and probable consequence of the act or failure to act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

> "There may be more than one cause of death. An act or failure to act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death."[18]

CALCRIM No. 620 repeated the same language from CALCRIM No. 520 regarding multiple causes of death. It also contained several paragraphs explaining the impact of any negligence by the victim or her doctors. Specifically, the jury was instructed that while the victim's or her doctors' actions may have contributed to the victim's death, Zemek could still be found liable so long as her act [or failure to act] was a substantial factor in the victim's death. The instruction went on to explain that if Zemek's act or failure to act was not a substantial factor causing the death, and the death was caused by grossly improper treatment by the doctors, then Zemek was

---

[18]    CALCRIM No. 580 was substantially similar to CALCRIM No. 520, but it omitted the phrase "or failure to act" throughout most of the instruction until the last paragraph wherein the instruction informed the jury what the prosecution had to prove. The special instruction on the elder abuse enhancement was nearly identical except that it included the word "proximately" as follows: "An act or failure to act proximately causes death if the death is a direct, natural, and probable consequence of the act or failure to act and the death would not have happened without the act or failure to act."

39

not legally responsible. (See CALCRIM No. 620.) Lastly, the instruction explained that even if the victim's vulnerability meant that she may have died of other causes in a short time, so long as Zemek's act [or failure to act] was a substantial factor in causing the victim's death, Zemek was legally responsible for the death. (See *ibid*.)

### C. Analysis

Pinpoint instructions relate particular facts to a legal issue or pinpoint the crux of a defendant's case. (*People v. Gutierrez* (2009) 45 Cal.4th 789, 824.) "Parties are entitled to legally correct and factually warranted pinpoint instructions, should they request such additional instruction." (*People v. Lyon* (2021) 61 Cal.App.5th 237, 252.) But a trial court may "refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence." (*People v. Moon* (2005) 37 Cal.4th 1, 30.) We review claims of instructional error de novo. (*Lyon*, at p. 253.)

The trial court properly declined to give Zemek's pinpoint instruction. First, the requested instruction was largely a restatement of the requirement that the victim's death must have been the direct, natural, and probable consequence of Zemek's failure to act—something that the above-mentioned portions of CALCRIM Nos. 520, 580, 620, and the special instruction on the elder abuse enhancement already explained to the jury. The given instructions properly described to the jury that the defendant's failure to act caused the victim's death if the death was the direct, natural, and probable consequence (defined as something a reasonable person would know is likely to happen if nothing unusual intervenes) of the failure to act. As such, while the given instructions did not explicitly include or define the phrase "independent intervening cause," the instructions nevertheless conveyed that

40

if something "unusual" intervened, a death might not be the direct, natural, and probable consequence of the defendant's failure to act.

The given instructions also properly told the jury that although Zemek's failure to act need not be the only factor that caused the victim's death, it needed to be a "substantial" factor—meaning more than a trivial or remote factor—in causing the death. Further, Zemek does not argue that any of the jury instructions provided misstated the law or were otherwise incorrect. Because the given instructions were correct statements of the law, to the extent that the proposed pinpoint instruction echoed the given instructions, the proposed pinpoint instruction was duplicative and properly declined on that basis.

Moreover, the proposed pinpoint instruction was improperly argumentative and potentially confusing for the jury. An instruction that directs the jury to "consider" certain evidence is properly refused as argumentative. (*People v. Wright* (1988) 45 Cal.3d 1126, 1135 [in a proper instruction, what is pinpointed is not specific evidence as such, but the theory of the defendant's case].) Here, Zemek's proposed instruction pinpointed specific evidence (the accidental overdose or alleged suicide) and told the jury that it "must" decide which of those events occurred and whether they constituted an independent intervening cause. Yet, there was no such requirement to prove either occurrence to establish murder or elder abuse. Rather, the prosecution had to prove, beyond a reasonable doubt, that Zemek's failure to act (leaving the victim alone for three days) was a substantial factor in causing the victim's death. (See CALCRIM Nos. 520, 620.) Accordingly, because the given instructions accurately explained causation and the proposed pinpoint instruction was duplicative,

41

argumentative, and confusing, the trial court properly declined to give Zemek's proposed pinpoint instruction.

However, even if the trial court erred in failing to give the pinpoint instruction, we would conclude it to be harmless error. The failure to instruct the jury on an appropriate pinpoint instruction on the defense's theory of the case is reviewed for harmless error under *People v. Watson* (1956) 46 Cal.2d 818, 836. (*People v. Earp* (1999) 20 Cal.4th 826, 886–887; *People v. Sandoval* (2015) 62 Cal.4th 394, 421–422 ["failure to give a pinpoint instruction . . . is judged as state law error that is prejudicial only where there is reasonable probability of a more favorable result"].) The denial of a pinpoint instruction is harmless under *Watson* where the instructions that were given do not preclude findings consistent with the proposed pinpoint instruction's theory and where the defense counsel fully argued the point to the jury. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144.)[19]

Here, any error was harmless because, as set forth above, the standard causation instructions sufficiently addressed the principles stated in Zemek's proposed pinpoint instruction. Further, defense counsel specifically addressed the issue in his closing argument. The crux of that closing argument was that the victim's death was unforeseeable and that the victim's

---

[19]     Zemek argues the proper test for determining whether a jury instruction error violated a defendant's due process rights as well as the right to present a complete defense is the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24. We disagree. An instructional error that "relieves the prosecution of the burden of proving beyond a reasonable doubt each essential element of the charged offense, or that improperly describes or omits an element of an offense" requires the *Chapman* harmless error review. (*People v. Larsen* (2012) 205 Cal.App.4th 810, 829.) Because pinpoint instructions merely relate particular facts to legal issues in the case, the failure to give a pinpoint instruction is reviewed for prejudice under the *Watson* harmless error standard. (*Id*. at p. 830.)

accidental overdose or suicide was an intervening act.  At the beginning of his closing argument, defense counsel asserted that Zemek would have to be "Nostradamus" to have predicted that the victim would die if left alone for a few days.  To this end, counsel argued, "Was she really supposed to know that this woman would overdose in a three-day window?  Or that worse yet, the woman would take her own life in a three-day window?"

Defense counsel continued, "What I want you to consider when you're talking about causation . . . and that's where we are now, and there's a general causation instruction, and there are causation instructions as part of several of these individual counts, including the elder abuse, including the involuntary manslaughter, including the murder charges.  [¶]  And this is the first hint that we have that there's something called an independent intervening cause."  He also argued that if the victim committed suicide, that would serve as an independent intervening cause that would relieve Zemek of liability.

Later during the closing argument, defense counsel reiterated the point, using language that was nearly identical to that in his proposed pinpoint instruction.  After explaining that proximate cause was a required element of each offense, counsel urged the jury to consider "whether there is any independent intervening cause of this woman's death, like she decided to commit suicide, like she accidentally overdosed."  He asserted to the jury, "You've got to consider this.  You've got to look at this.  That's a big leap. Three days and you're going to impute that knowledge to this woman who regularly spent more than three days away from the woman from beginning to end?"

Additionally, we conclude any error here was harmless because, regardless of the instructions given, the jury would not have found that the

victim's actions constituted an unforeseeable intervening cause based on the circumstances in this case. Only "an unforeseeable intervening cause, an extraordinary and abnormal occurrence," rises to the level of "an exonerating, superseding cause." (*People v. Armitage* (1987) 194 Cal.App.3d 405, 420–421; see *People v. Schmies* (1996) 44 Cal.App.4th 38, 52 [to constitute a superseding cause, the victim's conduct must have been "so unusual, abnormal, or extraordinary that it could not have been foreseen"].) Absent such conduct, evidence the victim "may have shared responsibility or fault for the accident does nothing to exonerate [a] defendant for [her] role and is not relevant." (*Schmies*, at p. 51.)

The victim's act of overdosing on her seizure medication was not such an unusual, abnormal, or extraordinary event that it could not have been foreseen by Zemek. To the contrary, the record shows that Zemek knew that the victim had overdosed on the same medication on two prior occasions in the past two months. Further, even if, in spite of the dearth of evidence on this point, the jury believed the victim committed suicide, that too was foreseeable. As pointed out in the prior opinion, Zemek knew that the victim had a history of depression. (*Zemek I, supra,* 44 Cal.App.5th at p. 549.) Accordingly, any assumed error in declining to give Zemek's pinpoint instruction on causation was harmless.

V

EVIDENCE OF PRIOR THEFTS

A. Zemek's Contentions

Zemek argues the trial court prejudicially erred by allowing the prosecution to introduce evidence that on two prior occasions, Zemek stole money and jewelry from women for whom she was a quasi-caregiver. She

44

contends these prior acts were too dissimilar to the charged theft offenses in the instant action. We disagree.

## B. Background

Before trial, the prosecutor sought permission to introduce two prior thefts under Evidence Code section 1101, subdivision (b) to show, among other things,[20] intent to defraud as well as to establish a common plan or scheme. In his offer of proof, the prosecutor explained that in 1998, prior victim 1 went to a doctor for a medical procedure involving "sun spots." Although she was not a doctor, Zemek performed the procedure. Afterwards, the victim went to the restroom and Zemek stole several items of jewelry from the victim's purse. When she was later questioned about the missing jewelry, Zemek denied taking it and ultimately filed a defamation lawsuit against the victim, from whom she received a $10,000 settlement. Years later, the victim's jewelry was found in Zemek's safety deposit box.

As to the second prior act, the prosecutor explained that in 2000, Zemek was working as a receptionist and surgical coordinator at a surgical office. Prior victim 2 contacted Zemek after a procedure and complained of being in pain. Zemek offered to come to the victim's house to give her pain medication. At the victim's house, Zemek injected the victim with medication and waited for the victim to fall asleep. Once the victim was asleep, Zemek stole her credit cards, cash, checks, and jewelry. Zemek denied taking any of these items; however, police later found several of the victim's stolen jewelry pieces in Zemek's safety deposit box.

---

[20] The prosecution also sought to use the prior act evidence to prove Zemek's knowledge and willingness to undertake a duty of care as to the murder and elder abuse counts. However, the trial court denied this request.

The prosecutor argued that these prior acts were admissible because they (along with the charged theft offenses) involved thefts related to a duty of care. He argued that Zemek had "a signature mode of operation that involves victimizing women who are medically reliant on her to not do so."

At the hearing on the in limine motions, the court and parties engaged in a lengthy and detailed discussion concerning the facts of the prior offenses, the prosecutor's theories of admissibility, and defense counsel's opposition. After that discussion, the trial court indicated that it had conducted an Evidence Code section 352 analysis and ruled that the prior uncharged acts were admissible under Evidence Code section 1101, subdivision (b) to prove intent and common plan or scheme.

The prior act victims testified at trial consistent with the prosecutor's offer of proof.

At the conclusion of the trial, the jury was instructed with CALCRIM No. 303 that certain evidence was admitted for a limited purpose and that it could consider that evidence for the limited purpose only. The jury was further instructed with CALCRIM No. 375 as to the limited purpose of the prior act evidence. In pertinent part, that instruction told the jury that if it found that Zemek committed the two prior thefts, it could (but was not required to) "consider that evidence for the limited purpose of deciding whether the defendant acted with the intent to defraud or the defendant had a plan or scheme to commit the theft offenses alleged in this case." (CALCRIM NO. 375.) The instruction explicitly told the jury to consider any similarity (or lack thereof) between the charged and uncharged offenses, not to use the evidence for any other purpose, and not to conclude from the evidence that Zemek had a bad character or was disposed to commit crime. Additionally, the instruction told the jury that the prior act evidence was not

46

sufficient by itself to prove guilt and that the prosecution still had to prove each charge and allegation beyond a reasonable doubt. (See *ibid*.)

## C. Analysis

Evidence Code section 1101, subdivision (a) generally prohibits the admission of evidence of a prior criminal act against a criminal defendant " 'when offered to prove his or her conduct on a specified occasion.' " (*People v. Lindberg* (2008) 45 Cal.4th 1, 22; Evid. Code, § 1101, subd. (a).) However, subdivision (b) of Evidence Code section 1101 provides that such evidence is admissible when relevant to prove some fact in issue, such as motive, intent, knowledge, identity, or the existence of a common design or plan. (Evid. Code, § 1101, subd. (b).) A significant factor in determining the admissibility of a prior uncharged act under Evidence Code section 1101, subdivision (b) is the degree of similarity between the uncharged act and the charged crime. (See, e.g. *People v. Winkler* (2020) 56 Cal.App.5th 1102, 1145.) To be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant "probably harbor[ed] the same intent in each instance." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).)

To be admissible to prove a common plan or scheme, the uncharged act evidence must demonstrate " 'a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' " (*Ewoldt, supra*, 7 Cal.4th at pp. 402–403.) Also, although the uncharged crimes must be very similar to the charged offenses if offered to prove identity, a "lesser degree" of similarity is required to establish relevance on the issue of common design or plan, and the "least degree" of similarity is required to establish relevance on the issue of intent. (*People v. Lewis* (2001) 25 Cal.4th 610, 636–637.)

Here, the two uncharged thefts were sufficiently similar to the charged theft offenses to be relevant and probative regarding the issues of intent and common plan or scheme. Zemek met all three victims through quasi-medical procedures: she met the prior act victims through her jobs as a medical technician and surgical scheduler, and she met the current victim at a Botox party. Further, Zemek undertook a caregiving function as to all three victims. She performed the "sun spot" removal procedure on prior act victim 1; she administered pain medication to prior act victim 2; and she was Pam's paid caregiver.

Additionally, Zemek used her caregiver role to steal from each victim. She stole from prior act victim 1 while she was using the restroom following her procedure. She stole from prior act victim 2 after she fell asleep from the pain medication Zemek administered. And she stole from Pam's estate after she died due to Zemek's failure to provide care.

Against this backdrop, the evidence was properly admitted under Evidence Code section 1101, subdivision (b) to show that when Zemek took money from the victim's estate, she did so with the intent to steal and not, as she claimed, because she believed she was entitled to the money under the victim's will. (See *People v. Chhoun* (2021) 11 Cal.5th 1, 27 (*Chhoun*) ["if a person acts similarly in similar situations, [she] probably harbors the same intent in each instance"].) Also, by showing that Zemek acted pursuant to a common pattern in two similar prior thefts, the prior act evidence helped prove that Zemek committed the theft offenses in this case and, thus, was relevant and admissible to show a common plan or scheme. (See *People v. Myers* (2014) 227 Cal.App.4th 1219, 1224 [the purpose of common plan evidence is to prove the defendant engaged in a specific act, by showing that

she acted pursuant to a common pattern or planned course of conduct in similar prior instances].)

Moreover, the prior acts were not unduly prejudicial such that exclusion was required under Evidence Code section 352. "Even if evidence of the uncharged conduct is sufficiently similar to the charged crimes to be relevant for a nonpropensity purpose, the trial court must next determine whether the evidence's probative value is 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice of confusing the issues, or of misleading the jury.' " (*Chhoun*, *supra*, 11 Cal.5th at p. 26.) The prejudice that Evidence Code section 352 is designed to avoid "is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." (*People v. Baker* (2021) 10 Cal.5th 1044, 1089.) Rather, it generally refers to evidence "that prompts an emotional reaction against the defendant and tends to cause the trier of fact to decide the case on an improper basis." (*People v. Walker* (2006) 139 Cal.App.4th 782, 806.)

We conclude there was no such prejudice here. The testimony from the prior act victims was succinct. Further, testimony that Zemek stole money and jewelry from two (living) victims was far less likely to inflame the passions of the jury than the charged evidence, which involved Zemek's deliberate plan to gain the victim's trust and promise to care for her then, after becoming the sole beneficiary in her will, to leave her alone to overdose and die.

In asserting that the prior acts should have been excluded, Zemek's primary contention is that the prior acts were too dissimilar from the charged offenses. Yet, in making this argument, Zemek points only to insignificant factual differences, such as the fact that jewelry was stolen from the prior act

victims but not from Pam. This argument does not help Zemek because there is no requirement that the prior acts be identical to the charged offenses.

Zemek's claim that the jury may have used the prior act evidence for an impermissible purpose, such as to conclude that Zemek intentionally killed the victim to inherit from her estate, is speculative. The jury was properly instructed as to the limited purpose of the prior act evidence, and juries are presumed to follow the court's instructions. (*People v. Orloff* (2016) 2 Cal.App.5th 947, 957.) Moreover, defense counsel explicitly reminded the jury during closing argument that the prior acts had "nothing to do with the homicide counts."

Accordingly, because the prior thefts were sufficiently similar to the charged theft counts, they were relevant to prove both intent and common plan or scheme and were thus properly admitted under Evidence Code section 1101, subdivision (b) and Evidence Code section 352. As such, we conclude that the trial court did not abuse its discretion in admitting the prior acts evidence.

## DISPOSITION

The judgment is affirmed.

HUFFMAN, Acting P. J.

I CONCUR:


DO, J.

Dato, J., Concurring and Dissenting.

I concur in the majority opinion to the extent it holds that substantial evidence supports defendant Marilyn Joy Zemek's conviction for first degree murder and related counts. I respectfully dissent, however, from its conclusions that there was no violation of Zemek's right to a public trial and that no juror misconduct occurred in this case. Either of these errors requires reversal for a new trial.

### Defendant's Right to a Public Trial

The trial in this case occurred during the fall of 2020, a concededly challenging time. COVID-19 infections were increasing, sometimes with fatal results. Lawyers wore face masks; jurors were kept six feet from trial participants and each other. Plexiglass shielded the witnesses, jurors, court personnel, and sometimes the judge. But although it was not business as usual in the courthouse, "even in a pandemic, the Constitution cannot be put away and forgotten." (*Roman Catholic Diocese v. Cuomo* (2020) ___ U.S. ___, ___ [141 S.Ct. 63, 68] (*Catholic Diocese*).)

### A

The Sixth Amendment right to a public trial, made applicable to the states in *In re Oliver* (1948) 333 U.S. 257 (*Oliver*), is "for the benefit of the accused" so "the public may see [s]he is fairly dealt with and not unjustly condemned." (*Id.* at p. 270, fn. 25.) It has the salutary effect of "keeping h[er] triers keenly alive to a sense of their responsibility and to the importance of their functions." (*Ibid.*) Like many constitutional rights, the right to public trial is not absolute and may "give way in certain cases to other rights or interests." (*Waller v. Georgia* (1984) 467 U.S. 39, 45 (*Waller*).)

These interests must be sufficiently substantial[1] and, more importantly for our purposes, the trial closure must be "essential" and "narrowly tailored" to serve that interest. (*Waller,* at p. 45.) Thus, "the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." (*Id.* at p. 48.)

Of particular importance here, not all members of the public are identically situated when it comes to enforcing a defendant's right to a "public" trial.[2] Reflective of our common humanity, we recognize that the defendant's relatives and friends occupy a special position. They provide both

---

[1] In determining whether closing a trial is permissible, the Ninth Circuit has distinguished between "whether the courtroom closure is total or partial. A total closure of the courtroom means that '*all* persons other than witnesses, court personnel, the parties and their lawyers are excluded for the duration of the hearing' [Citation.]. A partial closure means the court has excluded only a limited number of persons from the courtroom, either for the duration of the proceeding or for a limited period of time (such as during one witness's testimony)." (*United States v. Allen* (9th Cir. 2022) 34 F.4th 789, 797.) Here, the closure was effectively "total." Although the trial court referred to a defense investigator and "victim advocate" being present, there was no explanation as to their exact functions and no one without a role in the trial was permitted to observe. In any event, the government's public health concern with protecting persons from the COVID-19 virus "is unquestionably a compelling interest." (*Catholic Diocese*, *supra*, 141 S.Ct. at p. 67.) The real question in this case is whether the exclusion of Zemek's family was essential and narrowly tailored to achieve this interest.

[2] Thus, the fundamental issue is not whether the Sixth Amendment provides greater rights to a defendant's family. (Maj. opn., *ante*, at p. 18.) The right to a public trial belongs to the defendant. The question is whether that constitutional right requires a court to treat the defendant's family differently than the public at large in crafting a closure order that is narrowly tailored to achieve the particular overriding interest.

2

psychological encouragement for the defendant and a tangible reminder to the jury that she is not a social outcast bereft of family and community support. As the United States Supreme Court has recognized, "[W]ithout exception, all courts have held that an accused is at the very least entitled to have [their] friends, relatives, and counsel present." (*Oliver, supra,* 333 U.S. at pp. 271–272; see also *State v. Brimmer* (Iowa 2022) 983 N.W.2d 247, 265 (*Brimmer*) ["Striking a proper balance means allowing at least the defendant's family to attend if possible within the parameters of the overriding interest [citation], as was done by other courts during COVID."]; *Tinsley v. United States* (D.C. 2005) 868 A.2d 867, 873 ["Of all members of the public, a criminal defendant's family and friends are the people most likely to be interested in, and concerned about, the defendant's treatment and fate, so it is precisely their attendance at trial that may best serve the purposes of the Sixth Amendment public trial guarantee."].) So just because there is good reason not to allow *every* member of the public to attend a trial does not absolve the court of the obligation to determine whether at least some family members can be accommodated. (*English v. Artuz* (2d Cir. 1998) 164 F.3d 105, 108 [applying the *Waller* factors, extent of the court closure must take account of "the relationship of those excluded to the complaining defendant"].)

Before and during her trial, Zemek repeatedly invoked these public trial rights by asking the judge to allow two people—her husband and sister—to attend court proceedings in person. During jury selection, the court denied defense counsel's first such request by explaining that the proceedings were "closed to the public" and Zemek's family members, like everyone else, would be limited to viewing a livestream video of the trial from a different room in the courthouse. When counsel pointed out, "They are not

3

the public. They are family," the judge rebuked him for "playing antics." The court saw no difference between members of the defendant's family and anyone else who wanted to observe the trial. According to the judge, "They are the public, they are [and] [t]he Court made good cause findings to close the proceedings to the public." Counsel persisted, explaining that the family members should be given special consideration because Zemek was entitled to their physical presence and support:

> "I think it's recognized under the United States Constitution and the California Constitution. It's not like they're newspaper reporters, it's not like they are just free-floating members of the public, they are close to this defendant. And I think under the Constitution, one or two more seats is not going to interfere with the number of jurors that we have impaneled, including the alternates, to allow them to be here. *They can be socially distanced. They could spread out. It's not going to interfere with any of the COVID protocols*, and it's going to provide the essential moral support to my client. And it also will allow the jury to see that she's not an orphan, that there are people here who care for her and are concerned about these proceedings." (Italics added.)

Unpersuaded, the court remarked, "[M]y ruling remains. . . . The Court already found good cause [to close the proceedings]."

Zemek's counsel continued to raise the issue in response to repeated problems with the livestream video throughout trial. Each time, the trial judge refused to recognize any obligation to separately evaluate the need to exclude one or two family members, focusing instead on a nonspecific finding of good cause to close the proceedings to the public in general.

For example, on the second day of testimony defense counsel informed the court that Zemek's "husband and family were unable to hear great portions of yesterday's proceedings due to some snafu with the livestream."

4

The clerk confirmed that the livestream was down for about two hours. Counsel again asked the court to permit the two family members to attend in person, reiterating that Zemek's public trial right "applies with more force to her husband and close family relations." He specifically noted that there were "two seats in the back row that are unoccupied by anybody and they could be socially distanced, six feet apart, if the court would permit them to attend." Denying the request, the trial judge cited infection statistics and commented that he was "not even allowing the victim's family under Marsy's Law."[3] Defense counsel replied, "The victim has no family"; the court responded, "Well, I didn't know that." Again, Zemek's lawyer emphasized, "My client does have family." Unmoved, the court stated, "We're about seven minutes behind schedule. Anything else?"

Several days before testimony concluded, during another discussion about livestream issues, defense counsel noted for the third time that "there is room in the back row" for Zemek's husband and sister "to be socially distanced." The court appeared to agree, but then deflected the issue by stating that two other people sometimes sat in the back row.[4] Counsel replied, "There's still room for at least her husband and her sister" and

---

[3] Marsy's Law, also colloquially known as the Victims' Bill of Rights Act of 2008, provides that a victim is entitled to be present at "all public proceedings . . . at which the defendant and the prosecutor are entitled to be present . . . ." (Cal. Const., art. I, § 28, subd. (b)(7).)

[4] The exchange was as follows:

> "[Defense Counsel:] I think the record should reflect that there is room in the back row for both of them to be socially distanced.

> "THE COURT: Right. But also let the record reflect that the victim advocate sits in the back. Also your investigator has been in the back row."

"[b]eyond that," the livestream had not been working for "at least three or four days." The court acknowledged receiving complaints about the livestream and, according to the clerk, the "IT person" said it was not going to be "an easy fix." The judge directed the clerk to determine if there was an empty courtroom with livestream capability. Meanwhile, the jury returned and testimony resumed. Later that morning, the trial was moved to a different courtroom.

B

As citizens of this nation, we take justifiable pride in the protection for individual rights provided by our Constitution, especially the first ten amendments we call the Bill of Rights as well as the due process clauses of the Fifth and Fourteenth Amendments. Unfortunately, our record of honoring and protecting these rights in times of crisis is checkered at best. (See, e.g., *Calvary Chapel Dayton Valley v. Sisolak* (2020) ___ U.S. ___, ___ [140 S.Ct. 2603, 2615] (dis. opn. of Kavanaugh, J. [dissenting from denial of injunctive relief]) ["history is littered with unfortunate examples of overly broad judicial deference" where the government invokes an emergency or crisis to abrogate fundamental rights].) In the heat of the moment, it may appear tempting to "suspend" protection for constitutional rights that inconveniently interfere with our efforts to deal with an emergency. But "[h]istory teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure." (*Skinner v. Ry. Labor Executives' Ass'n* (1989) 489 U.S. 602, 635 (dis. opn. of Marshall, J.).) In hindsight, the apparent value of expedience generally fades in the clarifying light of historical perspective. Or, more bluntly in Justice Marshall's words, "[W]hen we allow fundamental freedoms to be sacrificed in

the name of real or perceived exigency, we invariably come to regret it." (*Ibid.*)

Examples, lamentably, abound.  The ink on the Bill of Rights was hardly dry when, as an outgrowth of the Quasi-War with France in 1798, Congress passed the Alien and Sedition Acts.  These "infamous statutes" that criminalized core political speech are now remembered as a blatant violation of fundamental First Amendment principles.  (Ellis, Founding Brothers (2001) p. 190; see *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, 276 [although the legislation was never tested in court, "the attack upon its validity has carried the day in the court of history"].)

The American Civil War was arguably the most dire emergency ever confronted by the nation.  The Lincoln Administration's suspension of the writ of habeas corpus and creation of military tribunals to try civilians for sedition was not addressed by the United States Supreme Court until after the war's end.  But in *Ex parte Milligan* (1866) 71 U.S. 2 (*Milligan*), a unanimous court—including five Lincoln appointees—found the President's emergency actions unconstitutional.[5]  Evaluating the claimed exigency with the perspective of hindsight, the majority opinion forcefully rejected the government's argument that civil war justified suspending the judicial power of civilian courts in states that remained loyal to the Union:  "No doctrine, involving more pernicious consequences, was ever invented by the wit of man

---

[5]  Chief Justice Chase, as well as Justices Swayne, Miller, Davis and Field, were all appointed by President Lincoln.  Referring to the timing of the decision, Justice Davis's majority opinion candidly acknowledged that while the war was being waged, "the temper of the times did not allow that calmness in deliberation and discussion so necessary to a correct conclusion of a purely judicial question."  (*Milligan*, *supra,* 71 U.S. 2, 109.)

than that any . . . provisions [of the Constitution] can be suspended during any of the great exigencies of government." (*Milligan,* at p. 121.)

No more damning example exists than *Korematsu v. U.S.* (1944) 323 U.S. 214 (*Korematsu*), in which a majority of the United States Supreme Court approved the internment of United States citizens of Japanese ancestry during World War II. Even in the midst of the bloodiest conflict in world history, Justice Jackson's dissent recognized why resort to military "necessity" as justification for the internment order was inconsistent with fundamental constitutional principles: "[A] judicial construction of the due process clause that will sustain this order is a far more subtle blow to liberty than the promulgation of the order itself. . . . [O]nce a judicial opinion rationalizes such an order to show that it conforms to the Constitution, or rather rationalizes the Constitution to show that the Constitution sanctions such an order, the Court for all time has validated the principle of racial discrimination in criminal procedure . . . . The principle then lies about like a loaded weapon ready for the hand of any authority that can bring forward a plausible claim of an urgent need." (*Id.* at pp. 245–246 (dis. opn. of Jackson, J.).) It took more than 50 years, but the Court has now expressly acknowledged that "*Korematsu* was gravely wrong the day it was decided, has been overruled in the court of history, and—to be clear—'has no place in law under the Constitution.'" (*Trump v. Hawaii* (2018) ___ U.S. ___, ___ [138 S.Ct. 2392, 2423].)

C

With each of these examples, and others we could add, the "inconvenient" constitutional right is a different one—the First Amendment right of free expression, the right to judicial review protected by the Due Process Clause, the prohibition on racial discrimination afforded by the Equal

Protection Clause.  Likewise, the nature of the emergency varies from case to case.  It could be a foreign war, a domestic civil war, the War on Terror or the War on Drugs.  In this case we deal with a different kind of battle—a fight against a global pandemic—and a different constitutional right—the Sixth Amendment right to a public trial.

We draw from different examples throughout history not to suggest any equivalency regarding the constitutional deprivations at stake, but rather to underscore the critical role of judicial oversight in safeguarding individual rights in times of emergency.  Whenever the protection of established constitutional rights is claimed to conflict with the government's effective response to an emergency, it is not enough for the judicial branch, as guardians of the individual rights protected by the Constitution, to await the judgment of the "court of history" at some undetermined future point in time.  Rather, we have the responsibility to closely examine claims of exigent "necessity," with the benefit of whatever perspective the passage of time allows, against the applicable constitutional standard.  Indeed, it is only " '[b]y subjecting government incursions on civil liberties to meaningful judicial review [that] courts force the government to do its homework—to communicate not only the purposes of its actions, but also how the imposed restrictions actually relate to and further those purposes.' "  (Wiley & Vladeck, *Coronavirus, Civil Liberties, and the Courts:  The Case Against "Suspending" Judicial Review* (2020) 133 Harvard L.Rev. Forum 179, 195.)

For the trial court in this case, the issue seemed simple.  It decided that the danger of infection justified closing the courtroom to the public.  Although social distancing had been accepted as the standard basis for deciding how many people could occupy a particular space, the court did not concern itself with that level of detail.  Zemek's husband and sister were members of the

public. They were entitled to no special consideration, and were excluded just like members of the victim's family. The fact that the victim had no family was beside the point.

This reasoning cannot be squared with the established constitutional requirements that a court narrowly tailor court closure orders and consider alternatives to complete exclusion. (*Waller, supra,* 467 U.S. at pp. 45, 48.) Applying the *Waller* test, courts have routinely found violations of a defendant's public trial right where circumstances justified restricting courtroom attendance but the court failed to consider whether a limited number of the defendant's family members could be present. (See, e.g., *Brimmer, supra,* 983 N.W.2d at p. 265 [order closing courtroom to all spectators during COVID-19 pandemic was not "narrowly tailored" in failing to "allow[ ] at least the defendant's family to attend if possible within the parameters of the overriding interest"]; *Vidal v. Williams* (2d Cir. 1994) 31 F.3d 67, 68 [although excluding the general public was justified, there was insufficient reason to prohibit defendant's parents from being present]; *State v. Tucker* (Ariz. Ct.App. 2012) 290 P.3d 1248, 1257 [exclusion of defendants' families along with the rest of the general public was broader than necessary to achieve the state interest]; *Watters v. State* (1992) 328 Md. 38, 45 [sheriff's order uniformly excluding members of the defendant's family as well as the press and the public was not "narrowly tailored" to address space limitations in the courtroom].) Similarly here, the record reflects that Zemek's two family members could have been accommodated, consistent with existing COVID-19 protocols, without undue risk to the trial participants.

The majority opinion suggests there is something "unfair" about evaluating the necessity for and breadth of the trial court's closure order in light of what three years' experience with the COVID-19 pandemic has

10

taught us.  (Maj. opn., *ante*, at p. 19.)  To the contrary, however, a certain temporal distance "allows that calmness in deliberation and discussion so necessary to a correct conclusion of a purely judicial question."  (*Milligan, supra,* 71 U.S. at p. 109.)  I submit, moreover, that our experience has merely highlighted what was missing from the justifications proffered by the court for excluding two of Zemek's family members, purported justifications we are constitutionally bound to dispassionately scrutinize.[6]  (See *Catholic Diocese, supra,* 141 S.Ct. at p. 68.)

We all remember what it was like in the fall of 2020 when we were trying to reclaim some level of normalcy based on limited and evolving information about pandemic risks.  But it is precisely when courts need to act on less-than-perfect information that we must demand their rigorous adherence to the well-established standards for proper decision making.  When we require that a court closure order be no broader than necessary, justified by specific findings, and that the court consider any and all reasonable alternatives that would narrow the order, we guard against unnecessary infringements on constitutional rights that merely serve the government's convenience or, worse yet, rest on unsubstantiated fear instead of evidence.

It is suggested that "[e]ach additional person permitted inside the courtroom (a confined space) is an additional person who may have COVID-19 and increases the risk of infection . . . ."  (Maj. opn., *ante,* at p. 20.)  True

---

[6]    "[C]ourts should not just police the Constitution's boundaries and set 'firm and unequivocal' lines during periods of calm.  They should also stand watch during periods of emergency, applying standard doctrines of judicial review and calling out unconstitutional action where they see it."  (Tyler, *Judicial Review in Times of Emergency:  From the Founding Through the COVID-19 Pandemic* (2023) 109 Va. L.Rev. 489, 581–582.)

enough, "but the fact that a line has to be drawn somewhere does not justify its being drawn anywhere." (*Pearce v. Commissioner* (1942) 315 U.S. 543, 558, dis. opn. of Frankfurter, J.)  The line must be drawn in a reasonable place, based on reasonable standards that account for the important constitutional interests at stake.  Here, personal attendance by at least *some* members of the defendant's family is the constitutional interest that must be accommodated if reasonably possible.

If the choice were an all-or-nothing one—limiting attendance to actual trial participants (judge, jurors, attorneys, court personnel, witnesses and the defendant) or accepting a crowded courtroom full of spectators—the line drawn by the trial court here might be defensible.  But those weren't the only options.  Defense counsel repeatedly informed the court that accepted social distancing criteria would permit *two* members of Zemek's family to be present.  If that wasn't factually accurate, the court or the prosecutor seeking to justify the closure order had an obligation to say so.  They did not.  Nor did the court offer any other reason why it was necessary to exclude the two family members, apart from its mistaken reference to the victim's nonexistent family.  Our collective experience over the last several years only confirms that the court's order—well-intentioned, perhaps—was arbitrary, unnecessarily restrictive, and ultimately unconstitutional.  And as the majority opinion concedes (maj. opn., *ante*, at p. 12), if this was error it was a structural one requiring reversal.

*Juror Misconduct*

What happened in the middle of defense counsel's closing argument is undisputed.  Counsel had hoped to finish by the end of the day on Tuesday, November 10 in advance of the court holiday on November 11, leaving only the prosecutor's rebuttal argument.  But as proceedings were about to

12

conclude, defense counsel apologized and indicated he still had some matters to discuss. In other words, closing argument was always going to continue on Thursday, November 12; the only question was which attorney would be speaking when proceedings resumed?

The judge adjourned court for the day and left the courtroom. As the jury was preparing to leave, one of the jurors expressed his frustration with defense counsel: " 'This trial's never going to end. That's *his* strategy.' " (Italics added.) The prosecutor confirmed hearing the substance of the statement.

I submit that the frustrated juror's meaning is obvious. He had personally concluded the defendant was guilty, and nothing else defense counsel could say was going to change that. In this juror's view, defense counsel knew his client was guilty and had adopted a strategy to delay the day of reckoning for as long as possible by offering an interminable closing argument. Perhaps one might conjure other more benign interpretations,[7] but the most reasonable one is far from benign.

For a juror to form or express any opinion about the defendant's guilt before the case is submitted to the jury for decision is " 'serious misconduct,' " pure and simple. (*People v. Weatherton* (2014) 59 Cal.4th 589, 598 (*Weatherton*); Pen. Code, § 1122, subd. (b); see also *People v. Linton* (2013) 56 Cal.4th 1146, 1194.) Where a juror is shown to have engaged in misconduct—and in particular by prematurely forming or expressing an opinion on guilt—"the defendant is afforded the benefit of a rebuttable

---

[7] The majority opinion suggests that the juror "did not say that he had already made up his mind," but merely "expressed his frustration regarding the length of defense counsel's closing argument." (Maj. opn., *ante*, at p. 28.) That might be a fair reading if the juror had simply said, " 'This *argument* is never going to end.' "

13

presumption of prejudice." (*People v. Cissna* (2010) 182 Cal.App.4th 1105, 1116–1117; see *In re Hitchings* (1993) 6 Cal.4th 97, 118.) Indeed, it is difficult to imagine how a juror prematurely forming an opinion on guilt could *not* be prejudicial, even if that opinion was communicated to no one else. A defendant is entitled to a unanimous verdict following the thoughtful deliberation of *12* impartial jurors, not 11. (See *People v. Holloway* (1990) 50 Cal.3d 1098, 1112.)

Here, the trial court accepted that the juror made the statement as alleged ("I agree that the statement happened") and that it constituted misconduct ("I agree with you that there was some misconduct"). In the court's mind, however, the defendant didn't satisfy her "burden" of demonstrating that the misconduct "[rose] to the level" of requiring that the juror be excused.

The trial court seems to have relied on a principle of *de minimis* juror misconduct in refusing to take any action beyond repeating the desultory admonition not to "express any opinion about this case until you are in the jury deliberation room." This was the same admonition the juror in question had already ignored. It is true, of course, that not every minor transgression mandates removal of the offending juror, nor does every allegation of misconduct require an evidentiary hearing. (See, e.g., *People v. Bell* (2019) 7 Cal.5th 70, 120.) " 'Where the misconduct is of such trifling nature that it could not in the nature of things have prevented either party from having a fair trial, the verdict should not be set aside.' " (*People v. Calles* (2012) 209 Cal.App.4th 1200, 1211, quoting *Enyart v. City of Los Angeles* (1999) 76 Cal.App.4th 499, 507.)

But the misconduct in this case was far from trifling. It went to the heart of the defendant's right to jury deliberations by 12 jurors, each of whom

14

had not yet formed or expressed an opinion on her guilt. If, despite its statement that "there was some misconduct," the trial court believed there was a legitimate question what the juror meant by his statement, it should have conducted a hearing and examined the juror, as defense counsel urged. (See *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 70 [trial court "must hold a hearing when it learns of allegations which, if true, would constitute good cause for a juror's discharge"].) The court was not permitted to assume the most benign interpretation without *any* facts to support it, and then use that assumption as the justification for conducting no further inquiry.

The trial court's analysis here is functionally identical to the reasoning employed by the trial judge in *Weatherton,* who found misconduct but concluded that it " '[did] not rise to the level that there is a substantial likelihood [of bias].' " (59 Cal.4th at p. 600.) As the California Supreme Court explained, however, "This formulation has it backward." (*Ibid.*) A finding of juror misconduct creates a presumption of prejudice. After that, there is no "burden" on the defendant. The burden is on the prosecution to demonstrate a *lack* of prejudice. Even assuming that a further investigation might have developed evidence to support such a claim, here the court chose not to conduct one. As a result, the prosecutor never made the showing necessary to rebut the presumption of prejudice, compelling reversal on this independent ground.

DATO, J.

15